## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ODESSA MOSLEY, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 09-0284-KD-C** |
| | ) | |
| **WYETH, INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## ORDER

This matter is before the Court on Actavis, Inc. and Actavis-Elizabeth, LLC (collectively, "Actavis")'s motion to dismiss (Docs. 15 & 16), notice of supplemental authority (Doc. 30), and reply brief (Doc. 44); the plaintiffs' response to Actavis' motion to dismiss (Doc. 33); Pliva USA, Inc. ("Pliva")'s motion for judgment on the pleadings (Doc. 48); the plaintiffs' response to the motion for judgment on the pleadings (Doc. 57); and Pliva's reply brief (Docs. 71 & 72) and notice of supplemental authority (Doc. 91).

For the reasons set forth herein, both the motion to dismiss filed by Actavis and Pliva's motion for judgment on the pleadings are **DENIED**.

## **FINDINGS OF FACT**[1]

1.       Sometime in 2005, Odessa Mosley's treating physician prescribed Reglan at a dosage of 10 mg to treat her reflux, nausea and vomiting. (Doc. 1, ¶ 3.08) The active ingredient in Reglan

---

[1] All factual allegations are construed in the light most favorable to the plaintiff. *See, e.g., Brower v. County of Inyo*, 489 U.S. 593, 598 (1989); *Garfield v. NHC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006).

is metoclopramide and metoclopramide HC1, a dopamine antagonist. (*Id*. at ¶ 3.09) Mrs. Mosley ingested the Reglan as prescribed on a long-term basis. (*See id*. at ¶¶ 3.11-3.13)

2.     According to plaintiffs, Mrs. Mosley's physician prescribed the drug as a long-term treatment for her reflux and associated problems based upon his/her reliance "upon information published in the package inserts and/or the Physicians' Desk Reference [] or otherwise disseminated by the Reference Listed Drug Company [] and/or the New Drug Application Holder []." (*See id*. at ¶ 3.10)

3.     Actavis-Elizabeth, LLC, is a wholly-owned subsidiary of Actavis, Inc. and the successor to Purepac Pharmaceutical, Inc., a company no longer in existence. (Doc. 1, at ¶ 1.05) Actavis is a manufacturer, marketer and distributor of generic metoclopramide. (*See id*. at ¶¶ 3.05 & 3.59)

4.     Pliva is a manufacturer, marketer and distributor of generic metoclopramide. (*See id*. at ¶¶ 3.04 & 3.59)

5.     In mid-2007, Mrs. Mosley began exhibiting abnormal body movements "which have since been linked to her use of Reglan/metoclopramide." (*Id*. at ¶ 3.15) As a result of her prescribed long-term use of Reglan/metoclopramide, Mrs. Mosley was caused to develop tardive dyskinesia. (*Id*. at ¶ 3.16) "'Tardive dyskinesia is a neurological disorder, irreversible in some cases, that is characterized by involuntary, uncontrollable movements of various muscles, especially around the face.'" *Riggins v. Nevada*, 504 U.S. 127, 134 (1992) (citation omitted); *see also Mills v. Rogers*, 457 U.S. 291, 293 (1982) (tardive dyskinesia is a disease "characterized in its mild form by involuntary muscle movements, especially around the mouth[]" but can be "even more disabling in its most severe forms.");     *see* THE SLOANE-DORLAND ANNOTATED MEDICAL-LEGAL

DICTIONARY, at 201 (Supp. 1992) (describing tardive dyskinesia as "an iatrogenic extrapyramidal disorder produced by long-term administration of antipsychotic drugs; it is characterized by oral-lingual-buccal dyskinesias that usually resemble continual chewing motions with intermittent darting movements of the tongue; there may also be choreoathetoid movements of the extremities. The disorder is more common in women than in men and in the elderly than in the young, and incidence is related to drug dosage and duration of treatment. In some patients symptoms disappear within several months after antipsychotic drugs are withdrawn; in others symptoms may persist indefinitely."). Mrs. Mosley's tardive dyskinesia is permanent. (Doc. 1, ¶ 3.28)

6.      The plaintiffs allege that in February of 2009, the United States Food and Drug Administration issued an advisory requiring the addition of a boxed warning for Reglan/metoclopramide, same setting forth that "'[c]hronic treatment with metoclopramide can cause tardive dyskinesia,'" and warning physicians and patients that "'[p]rolonged treatment (greater than 12 weeks) with metoclopramide should be avoided in all but rare cases[.]'" (Doc. 1, at ¶ 3.19) The plaintiffs allege that "Finally, the FDA is now requiring that manufacturers[] implement a Risk Evaluation and Mitigation Strategy because the FDA has determined that the use of Reglan/metoclopramide 'pose[s] a serious and significant public health concern requiring the distribution of a Medication Guide.' This Medication Guide, setting out all the risks of the drug and to be given to all users 'is necessary for the patients' safe use of Reglan (metoclopramide)[.]'" (*Id.*)

7.      On May 21, 2009, plaintiffs filed this lawsuit against Actavis, Pliva, and others asserting that they are entitled to damages and other relief from the defendants based upon their negligence (Doc. 1, ¶¶ 4.01-4.04), strict liability (*id.* at ¶¶ 4.05-4.07), breach of express and implied warranties (*id.* at ¶¶ 4.08-4.09), misrepresentation and fraud (*id.* at ¶¶ 4.10-4.15), and gross

negligence (*id*. at ¶¶ 5.01-5.03).[2] Plaintiffs makes the following relevant assertions against Actavis and Pliva (together, the "generic manufacturer defendants"):

3.20   This case involves Defendants' failure to warn doctors and patients of information within their knowledge or possession which indicated that the subject Reglan/metoclopramide, when taken for long periods of time, caused serious, permanent and debilitating effects, including tardive dyskinesia.

3.21   Defendants jointly and severally marketed, manufactured and distributed Reglan/metoclopramide and encouraged the long term use of these drugs, misrepresented the effectiveness of these drugs and concealed the drug's dangerous side effects.

3.22   Reglan/metoclopramide is indicated only as short-term therapy for symptomatic gastroesophageal reflux and acute and recurrent diabetic gastric stasis.

3.23   Reglan/metoclopramide is indicated only for use for no greater than 12 weeks; however, Defendants represented that Reglan/metoclopramide was safe for use to treat nausea and/or esophageal reflux for durations that exceed 12 weeks.

3.24   Patients who use Reglan/metoclopramide for long periods are at a significantly increased risk of developing a severe and permanent neurological movement disorder.

3.25   Other serious side effects caused by ingesting Reglan/metoclopramide for long periods include, but are not limited to, central nervous system disorders, depression with suicidal ideation, akathesia, tardive dyskinesia, tardive dystonia, visual disturbances and interference with drug metabolism.

3.26   Patients who use Reglan/metoclopramide for long periods who are not able to effectively metabolize it are at a greater risk of developing these serious and permanent injuries.

3.27   Tardive dyskinesia, one of the serious side effects associated with the ingestion of Reglan/metoclopramide[,] is a debilitating neurological disorder that often results in involuntary and uncontrollable movements of the head, neck, face, arms, legs and trunk, in addition to facial grimacing, uncontrollable tongue movements and other involuntary movements. Presently, there is no cure for tardive dyskinesia.

---

[2] Ms. Mosley's husband, Ulysses Mosley, seeks damages for loss of consortium. (Doc.1, at 24)

4

3.28    Mrs. Mosley's diagnosed tardive dyskinesia, caused by the ingestion of metoclopramide, is permanent.

. . . .

3.59    Defendants Pliva and Actavis each submitted an Abbreviated New Drug Application (ANDA) to the FDA, based on representations made by the RLD [Reference Listed Drug] companies, requesting permission to manufacture, market, and distribute generic Reglan/metoclopramide.

3.60    Under the ANDA process, the Code of Federal Regulations *required* Pliva and Actavis to submit labels for Reglan/metoclopramide initially identical in all material respects to the reference listed drug label.

3.61    Under the Code of Federal Regulations, Pliva and Actavis had a duty to ensure their Reglan/metoclopramide warnings to the medical community were accurate and adequate, to conduct post market safety surveillance, to review all adverse drug event information, and to report any information bearing on the risk and/or prevalence of side effects caused by Reglan/metoclopramide.

3.62    Under the Code of Federal Regulations, if Pliva and Actavis discover information in the course of the fulfillment of their duties as outlined above, they must report that information to the medical community, Plaintiffs and other foreseeable users of Reglan/metoclopramide to ensure that their warnings are continually accurate and adequate.

3.63    Defendants Pliva and Actavis failed to investigate the accuracy of their metoclopramide and/or metoclopramide HC1 drug labels.

3.64    Defendants Pliva and Actavis failed to review the medical literature for the metoclopramide drug and/or metoclopramide HC1 drug.

3.65    Defendants Pliva and Actavis relied upon the name brand manufacturer and the referenced listed drug companies to review the aforementioned medical literature for Reglan/metoclopramide.

3.66    Under the FDA schema, if the FDA approves a label change as requested by an ANDA holder, the NDA holder (also referred to as the RLD company) must also amend its label.

3.67    Defendants Pliva and Actavis failed to communicate the true and accurate risks and/or prevalence of severe neurological side effects resulting from the ingestion of drugs containing Reglan/metoclopramide.

5

3.68    Defendants disseminated to physicians, through package inserts, the publication of the PDR, and otherwise, information concerning the properties and effects of Reglan/metoclopramide, with the intention that physicians would rely upon that information in their decisions concerning the prescription of drug therapy for their patients.

3.69    Defendants knew, or should have known through the exercise of reasonable care, that the package insert for Reglan/metoclopramide substantially understated the prevalence of acute and long-term side effects on ingesting the drug.

3.70    Defendants failed to use reasonable care to modify the package insert to adequately warn physicians about the true risks of both short-term and long-term use, even after several injured patients filed lawsuits alleging inadequate warnings and produced competent expert testimony supporting their allegations.

3.71    Defendants owed a duty in all of their several undertakings, including the dissemination of information concerning Reglan/metoclopramide, to exercise reasonable care  to ensure that they did not create unreasonable risks of personal injury to others.

3.72    Reglan/metoclopramide was widely advertised by Defendants as a safe and effective treatment of diabetic gastroparesis, gastroesophageal reflux disease (GERD) and other gastrointestinal disorders.

3.73    Defendants failed to conduct and report post market safety surveillance on Reglan/metoclopramide.

3.74    Defendants failed to review all adverse drug event information and to report any information bearing upon the adequacy and accuracy of their warnings, efficacy, or safety, including the risks and/or prevalence of side effects caused by Reglan/metoclopramide.

3.75    Defendants failed to monitor all relevant scientific literature related to Reglan/metoclopramide.

3.76    Defendants failed to disclose material safety information regarding the serious and permanent side effects caused by taking Reglan/metoclopramide for long periods of time.

3.77    Defendants failed to report data, *regardless of the degree of significance*, regarding the adequacy and/or accuracy of their warnings, efficacy or safety of Reglan/metoclopramide.

3.78    Defendants knowingly concealed from physicians material facts

bearing on the interpretation of package insert disclosures that exposure to Reglan/metoclopramide can lead to tardive dyskinesia and other extrapyramidal side effects, that the risk is "believed" to increase with duration of therapy and total cumulative dose, and that therapy for longer than 12 weeks "cannot be recommended."

3.79    Defendants concealed the fact that earlier false information disseminated by A.H. Robins Company and/or Wyeth representing long-term Reglan/metoclopramide therapy to be reasonably safe, was unscientific and false.

3.80    Defendants concealed the fact that Reglan/metoclopramide is a neuroleptic agent and dopamine antagonist, which can be expected to lead to tardive dyskinesia and other extrapyramidal side effects with approximately the same high frequency, particularly in longer term use, as other neuroleptic drugs and that epidemiological studies have consistently confirmed their expectation.

3.81    Defendants also concealed the fact that the treatment of chronic or intermittent gastroesophageal reflux and/or diabetic gastroporesis and/or other gastric disorders with  Reglan/metoclopramide for longer than 12 weeks is unlikely to be reasonably safe.

3.82    Some or all of the Defendants, as a result of their participation as defendants in previous litigation concerning  Reglan/metoclopramide products[,] received clear notice of Wyeth's suppression of important safety information concerning Reglan/metoclopramide, yet despite this notice chose to ignore the information and join consciously in the suppression.

. . . .

4.13    Defendants misrepresented to the FDA, Plaintiffs, and the health care industry the safety and effectiveness of Reglan/metoclopramide and/or fraudulently, intentionally and/or negligently concealed material information, including adverse information regarding the safety and effectiveness of Reglan/metoclopramide.

(Doc. 1, at ¶¶ 3.20-3.28, 3.59-3.82 & 4.13 (footnote omitted; emphasis in original))

## CONCLUSIONS OF LAW

### A.    Motion to Dismiss Standard.

Actavis moves to dismiss plaintiff's negligence, strict liability, breach of warranty and gross negligence claims arguing that these claims are pre-empted by federal law.  Pursuant to Rule

12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint on the basis that the plaintiffs have failed to state a claim upon which relief may be granted. *See* Fed.R.Civ.P. 12(b)(6). A Rule 12(b)(6) motion questions the legal sufficiency of a complaint (or portions of a complaint); therefore, in assessing the merits of a Rule 12(b)(6) motion, the court must assume that all the factual allegations set forth in the complaint are true. *See, e.g., United States v. Gaubert*, 499 U.S. 315, 327 (1991); *Powell v. Lennon*, 914 F.2d 1459, 1463 (11th Cir. 1990). Moreover, all factual allegations are to be construed in the light most favorable to the plaintiff. *See, e.g., Brower v. County of Inyo*, 489 U.S. 593, 598 (1989); *Garfield v. NHC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006). The rules of pleading require "only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-555 (2007). However, even accepting the facts alleged as true, a court may grant a motion to dismiss if, "on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Marshall County Bd. of Educ. v. Marshall County Gas Dist.*, 992 F. 2d 1171, 1174 (11th Cir. 1993).

### B.    Motion for Judgment on the Pleadings Standard

Pliva moves for judgment on the pleadings arguing that plaintiff's claims are pre-empted by federal law. Rule 12(c) of the Federal Rules of Civil Procedure provides that "After the pleadings are closed . . . , any party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). The Eleventh Circuit has held that "[j]udgment on the pleadings is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and judicially noticed facts." *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir.1998). Under this standard, judgment should not be entered "'unless it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim which would entitled him to relief.'" *Id.*

(citing *Slagle v. ITT Hartford*, 102 F.3d 494, 497 (11th Cir.1996)).  Alternatively, if the court relies

upon matters outside of the pleadings, the motion is converted to a motion for summary judgment.

     **C.**    **<u>Federal Preemption</u>**.

     The preemption analysis to be engaged in by this Court must be guided by two

jurisprudential cornerstones:

> First, the purpose of Congress is the ultimate touchstone in every pre-
> emption case. Second, in all pre-emption cases, and particularly in
> those in which Congress has legislated in a field which the States have
> traditionally occupied, . . . we start with the assumption that the
> historic police powers of the States were not to be superseded by the
> Federal Act unless that was the clear and manifest purpose of
> Congress.

*Wyeth v. Levine*, ___ U.S. ___, 129 S.Ct. 1187, 1194-95 (2009) (internal quotation marks and

citations omitted).  The high court elaborated on these cornerstones in *Medtronic, Inc. v. Lohr*, 518

U.S. 470, 485 (1996):

> Although our analysis of the scope of the pre-emption statute must
> begin with its text, our interpretation of that language does not occur
> in a contextual vacuum. Rather, that interpretation is informed by two
> presumptions about the nature of pre-emption.
>
>                    . . . .
>
> First, because the States are independent sovereigns in our federal
> system, we have long presumed that Congress does not cavalierly
> pre-empt state-law causes of action. In all pre-emption cases, and
> particularly in those in which Congress has legislated . . . in a field
> which the States have traditionally occupied, we start with the
> assumption that the historic police powers of the States were not to
> be superseded by the Federal Act unless that was the clear and
> manifest purpose of Congress . . . .
>
>                    . . . .

> Second, our analysis of the scope of the statute's pre-emption is guided by our oft-repeated comment, initially made in *Retail Clerks v. Schermerhorn*, 375 U.S. 96 . . ., that the purpose of Congress is the ultimate touchstone in every pre-emption case. As a result, any understanding of the scope of a pre-emption statute must rest primarily on a fair understanding of congressional purpose. Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it. Also relevant, however, is the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law.

*Id.* (internal quotation marks, citations and emphasis omitted); *see also Bates v. Dow Agrosciences, LLC*, 544 U.S. 431, 449 (2005) ("[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not pre-empt state-law causes of action. In areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest." *Id.* (internal quotation marks and citations omitted)).

"The bar to a finding of pre-emption is set even higher" when "federal law provides no remedy for an injured consumer." *Demahy v. Actavis, Inc.*, No. 08-31204, ___ F.3d ___, 2010 WL 46513, at * 4 (5th Cir. Jan. 8, 2010). And "[c]ourts have been particularly reluctant to find preemption in such cases without an unambiguous signal of congressional intent. This is especially true in cases that involve health and safety concerns because '[s]tates traditionally have had greater latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.'" *Id.* (quoting *Lohr*, 518 U.S. at 485 (1996) and collecting cases).

It long has been established that state law is preempted under the Supremacy Clause of the United States Constitution in three circumstances. *English v. General Electric Co.,* 496 U.S. 72, 78

(1990); *see Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000) ("A fundamental principle of the Constitution is that Congress has the power to preempt state law.").  Preemption results when Congress explicitly preempts state action; when state law regulates conduct in a field that Congress intended to be exclusively the province of federal law ( field preemption); and/or when state law actually conflicts with federal law, either because it poses an obstacle to the accomplishment and execution of Congress' purposes or because it renders compliance with federal law impossible (conflict preemption).  The Supreme Court has described the three sets of circumstances that give rise to preemption as follows:

> First, Congress can define explicitly the extent to which its enactments pre-empt state law. Pre-emption fundamentally is a question of congressional intent, and when Congress has made its intent known through explicit statutory language, the court's task is an easy one.

> Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. Such an intent may be inferred from a scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, or where an Act of Congress touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. Although this Court has not hesitated to draw an inference of field pre-emption where it is supported by the federal statutory and regulatory schemes, it has emphasized: Where . . . the field which Congress is said to have pre-empted includes areas that have been traditionally occupied by the States, congressional intent to supersede state laws must be clear and manifest.

> Finally, state law is pre-empted to the extent that it actually conflicts with federal law. Thus, the Court has found pre-emption where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*English,* 496 U.S. at 78-79 (internal quotation marks and citations omitted).

Actavis and Pliva rely on both the "impossibility"- and "obstacle"-  prongs of the third category of preemption, which is referred to generally as "conflict preemption":  "Conflict preemption can be either direct or indirect. Direct conflict (or 'impossibility preemption') occurs 'where it is impossible for a private party to comply with both state and federal requirements'; indirect conflict (or 'obstacle preemption') exists 'where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Witczak v. Pfizer, Inc.,* 377 F.Supp.2d 726, 728 (D. Minn. 2005).  The court in *Witczak* has observed that "[b]ecause conflict preemption is based on the presumed (rather than stated) intent of Congress, courts are advised to apply it sparingly." *Id.*

> **D.    The Federal Food, Drug, and Cosmetic Act (FDCA), the New Drug Application ("NDA") Process, the Abbreviated New Drug Application ("ANDA") Process, and Means Available to Drug Manufacturers for Adding or Strengthening Warnings.**

The FDCA was enacted in the 1930s, at a time when "Congress became increasingly concerned about unsafe drugs and fraudulent marketing[.]" *Levine,* ___ U.S. at ___, 129 S.Ct. at 1195.  Last year, the Supreme Court in *Levine* held that failure-to-warn claims against brand-name drug manufacturers[3] are not preempted by the Federal Food, Drug, and Cosmetic Act ("FDCA").  The *Levine* opinion excerpts the history of the FDA, noting that it was explicitly amended in 1962 to preserve state-law claims against drug manufacturers and again amended in 2007 to permit drug manufacturers to alter their drug labels without prior Food and Drug Administration ("FDA")

---

[3]  Brand-name manufacturers are also referred to as manufacturers of new drugs, or "reference-listed" drugs.

approval based on safety information that becomes available after a drug's initial approval:

> The Act's most substantial innovation was its provision for premarket approval of new drugs. It required every manufacturer to submit a new drug application, including reports of investigations and specimens of proposed labeling, to the FDA[4] for review. Until its application became effective, a manufacturer was prohibited from distributing a drug. The FDA could reject an application if it determined that the drug was not safe for use as labeled, though if the agency failed to act, an application became effective 60 days after the filing.

> In 1962, Congress amended the FDCA and shifted the burden of proof from the FDA to the manufacturer. Before 1962, the agency had to prove harm to keep a drug out of the market, but the amendments required the manufacturer to demonstrate that its drug was safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling before it could distribute the drug. In addition, the amendments required the manufacturer to prove the drug's effectiveness by introducing substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling.

> As it enlarged FDA's powers to protect the public health and assure the safety, effectiveness, and reliability of drugs, Congress took care to preserve state law. The 1962 amendments added a savings clause, indicating that a provision of state law would only be invalidated upon a direct and positive conflict with the FDCA. Consistent with that provision, state common-law suits continued unabated despite . . . FDA regulation. And when Congress enacted an express pre-emption provision for medical devices in 1976,[5] it

---

[4] The Food and Drug Administration ("FDA") "is the federal agency charged by Congress in the FDCA with regulating the manufacture, sale, and labeling of new prescription drug products that are marketed for human consumption and, in particular, [with] ensur[ing] the safety and efficacy of new drugs." *Mensing v. Wyeth, Inc.*, 562 F.Supp.2d 1056, 1059 (D. Minn. 2008) (citing 21 U.S.C. § 393), *rev'd on other grounds*, *Mensing v. Wyeth, Inc.*, 588 F.3d 603 (8th Cir. 2009); *see also Bernhardt v. Pfizer, Inc.*, 2000 WL 1738645, *3 (S.D. N.Y. 2000) ("Congress has granted the FDA the authority to ensure that drugs are safe and effective.").

[5] The Fifth Circuit recently observed that the Supreme Court has

> found Congress'[] enactment of an express preemption for medical devices

13

declined to enact such a provision for prescription drugs.

> In 2007, . . . Congress again amended the FDCA. For the first time, it granted the FDA statutory authority to require a manufacturer to change its drug label based on safety information that becomes available after a drug's initial approval. In doing so, however, Congress did not enact a provision in the Senate bill that would have required the FDA to preapprove all changes to drug labels. Instead, it adopted a rule of construction to make it clear that manufacturers remain responsible for updating their labels.

*Levine,* ___ U.S. at ___, 129 S.Ct. at 1195-1196 (internal quotation marks and citations omitted; footnotes added).

Manufacturers of new drugs, or "referenced-listed" drugs, must submit a new drug application ("NDA") to the Food and Drug Administration ("FDA") "which includes information demonstrating the drug's effectiveness and safety for its intended use." *Stacel v. Teva Pharmaceuticals, USA,* 620 F. Supp. 2d 899, 903 (N.D. Ill. 2009) (citation omitted). In connection with their NDAs, these brand-name drug manufacturers "must include a proposed labeling for the drug, which the FDA can approve or reject. After the FDA signs off on the drug and its label, the manufacturer must generally use the exact labeling that the FDA approved." *Id.* (citing 21 U.S.C. § 355; 21 C.F.R. § 314.104(b)).

There is an exception to this general rule, however, referred to as the "changes being effected," or CBE provision:

---

> telling, particularly given the historic coexistence of state tort remedies and federal regulation of prescription drugs. As the Supreme Court has repeatedly instructed, "[t]he case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to 'stand by both concepts and to tolerate whatever tension there [is] between them.

*Demahy v. Actavis,* No. 08-31204, ___ F.3d ___, 2010 WL 46513 (5th Cir. Jan. 8, 2010) (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 166-67 (1989)).

> . . . in limited circumstances the manufacturer may change the
> labeling after providing the FDA with notice of the change, but prior
> to actual FDA approval of the change. 21 C.F.R. § 314.70(c).  This
> section, referred to as the "change being effected" ("CBE")
> provision, may be utilized to "add or strengthen a contraindication,
> warning, precaution, or adverse reaction" or to "add or strengthen an
> instruction about dosage and administration that is intended to
> increase the safe use of the drug product." [*Id.*] at §
> 314.70(c)(6)(iii)(A),(C).

*Id.*; *see also Levine*, ___ U.S. at __, 129 S.Ct. at 1196.  Once a drug-related "risk to consumers has become 'apparent,' triggering a state-law duty to warn of it, 'the CBE regulation permit[s] [the manufacturer] to provide such a warning before receiving the FDA's approval.'"  *Demahy v. Actavis*, 2010 WL 46513, at * 3 (quoting *Levine*, 129 S. Ct. at 1198.

As noted above, Congress amended the FDCA in 2007 to "grant[] the FDA statutory authority to require a manufacturer to change its drug label based on safety information that becomes available after a drug's initial approval.  In doing so, however,  Congress did not enact a provision in the Senate bill that would have required the FDA to preapprove all changes to drug labels." *Levine*, ___ U.S. at __, 129 S.Ct. at 1196.  Rather "it adopted a rule of construction to make it clear that manufacturers remain responsible for updating their labels."  *Id.*

"The approval process for generic drug producers," like Actavis and Pliva, "is similar but not identical to that for reference-listed drug producers." *Stacel*, 620 F. Supp. 2d at 904.  In 1984, the Hatch-Waxman Act amended the FDCA to provide "an abbreviated new drug application procedure [] for manufacturers who produce a generic of a reference-listed drug that has already completed the NDA process." *Id*.

A "primary purpose of the Hatch-Waxman Amendments was to facilitate the availability of lower cost generic drugs," *Kellogg v. Wyeth*, 612 F.Supp.2d 437, 440-441 (D. Vt. 2009), and Hatch-

Waxman Act effectuated that purpose by providing an abbreviated process that would allow generic manufacturers to bring their drugs to market relatively quickly. These "Abbreviated New Drug Application," or "ANDA," drugs, also known as generic drugs,

> . . . must (1) be "the same as" a reference-listed drug that was already approved by the FDA with respect to active ingredients, route of administration, dosage form, strength and conditions of use recommended in the labeling; or (2) include changes from a reference-listed drug if the FDA has approved a petition from a prospective applicant permitting the submission of an ANDA for the changed drug product. One of the benefits to manufacturers who opt for the ANDA procedure is that they are required only to conduct "bioequivalency" studies that establish that the generic and the reference-listed drug are pharmaceutically equivalent; the ANDA procedure does not require the safety and effectiveness tests that are necessary under the NDA procedure. The underlying presumption is that so long as the drug is shown to be pharmaceutically equivalent to an existing reference-listed drug, and so long as it is used in the same manner as the reference-listed drug, FDA approval can be assumed without requiring duplication of previously-performed studies.

> [And a]s part of the ANDA application, a manufacturer must show that the labeling of the generic and reference-listed drug will be the same.[6]

---

[6] Section 355(j)(2)(A)(v) of Title 21 of the United States Code, which governs ANDAs, states that

> [a]n abbreviated application for a new drug shall contain—
>
> . . . .
>
> information to show that the labeling proposed for the new drug is the same as the labeling approved for the listed drug referred to in clause (i) except for changes required because of differences approved under a petition filed under subparagraph (C) or because the new drug and the listed drug are produced or distributed by different manufacturers.

*Id.*

A corresponding provision from the same subsection provides that

> the Secretary shall approve an application for a drug unless the Secretary

*Stacel,* 620 F. Supp. 2d at 905 (internal citations omitted; footnote added); *see also Bayer AG v. Elan*

*Pharmaceutical Research Corp.*, 212 F.3d 1241, 1244 (Fed.Cir. 2000), *cert. denied*, 531 U.S. 993

(2000) ("Under the FDCA, as amended by the Act, a pharmaceutical manufacturer submits an

ANDA when seeking expedited approval of a generic version of a drug previously approved by the

FDA (a 'listed drug').  An ANDA can be filed if the generic drug manufacturer's active ingredient

is the 'bioequivalent' of the listed drug." *Id.*  (internal citations omitted)).

The "regulations affecting generic drug applications state explicitly that the

CBE provisions apply to generic drug manufacturers just as they do to name-brand manufacturers."

*Stacel,* 620 F. Supp. 2d at 905; *see also Demahy v. Wyeth*, 586 F. Supp. 642, 650-51 (E.D. La.

2008), *aff'd sub nom., Demahy v. Actavis, Inc.*, 2010 WL 46513; *Kellogg,* 612 F.Supp. at 441 & 442;

*Kelly v. Wyeth*, No. 20033314F, 2007 WL 1302589,  *1 (Mass. Super. Apr. 12, 2007).  Section

314.97 of Title 21 of the Code of Federal Regulations governs "Supplements and other changes to

an approved abbreviated application."  As the *Stacel* court explained:

> The CBE regulations appear at 21 C.F.R. § 314.70(c)(6)(iii), which
> is located in Subpart B of Part 314. Subpart B is generally applicable
> to new applications, whereas, Subpart C is applicable to generic (or,
> "abbreviated") applications. *Compare* 314 C.F.R. Subpart B (titled
> "Applications") *with* Subpart C (titled "Abbreviated Applications").

---

> finds—
>
>             . . . .
>
> information submitted in the application is insufficient to show that the
> labeling proposed for the drug is the same as the labeling approved for the
> listed drug referred to in the application except for changes required
> because of differences approved under a petition filed under paragraph
> (2)(C) or because the drug and the listed drug are produced or distributed
> by different manufacturers . . .

*Id.* at § 355(j)(4)(G).

> However, section 314.97, which is located within Subpart C, states
> that "The applicant *shall* comply with the requirements of §§ 314.70
> and 314.71 regarding the submission of supplemental applications
> and other changes to an approved abbreviated application.

*Stacel,* 620 F. Supp. 2d at 905 (emphasis added).  The text of Section 314.70, which governs

"Supplements and other changes to an approved application" does not distinguish between new and

abbreviated drug applications, but instead refers generally to "application[s]."  Accordingly, the

CBE provisions apply to permit both brand-name and generic drug manufacturers to unilaterally

strengthen or add warnings.  *See Demahy v. Actavis*, 2010 WL 46513, at *7-10; *Stacel,* 620 F. Supp.

2d at 905; *see also Demahy v. Wyeth*, 586 F. Supp. at 650-51; *Kellogg,* 612 F.Supp. at 441 & 442;

*Kelly*, 2007 WL 1302589 at *1.

    In addition to unilaterally adding or strengthening warnings, generic drug manufacturers who

possess research or adverse event information warranting an added or strengthened warning may

also "apply for a labeling change through the major changes procedure, through which the FDA

provides a prompt determination regarding the sufficiency of the link between a drug and the

reported problem." *Kelly,* 2007 WL 1302589 at *4 (citing 21 C.F.R. § 314.70(b)); *see also Mensing*

*v. Wyeth*, 588 F.3d 603 (8th Cir. 2009); *Demahy v. Actavis*, 2010 WL 46513, at *10.

## E.    Actavis' Arguments in Support of the Motion to Dismiss Plaintiff's Negligence, Strict Liability, Breach of Warranty, and Gross Negligence Claims and Pliva's Arguments in Support of the Motion for Judgment on the Pleadings.

    Pliva's motion for judgment on the pleadings and Actavis' motion to dismiss the plaintiffs'

negligence, strict liability, breach of warranty, and gross negligence claims are based on conflict

preemption.  Actavis and Pliva contend that both conflict preemption prongs apply to bar the

plaintiff's claims.  Actavis and Pliva reason that permitting state suits based on insufficient labeling

18

would "require [them] to violate federal law [(i.e., compliance with both state and federal law would be impossible)] and pose an obstacle to Congressional objectives in:  1) enacting federal law to increase the availability of low-cost generic drugs; and 2) vesting with the FDA exclusive authority to regulate prescription drug labeling." (Doc. 16 at 5-16)

Pliva and Actavis argue, among other things, that plaintiffs' state-law claims are preempted because it is impossible for the generic manufacturers to comply with both state-law duties to warn consumers and their duties under the Hatch-Waxman Act to place the same language on proposed warning labels as that used by the brand-name manufacturer. (Doc. 16, at 5-16)

It is clear that in the course of seeking initial ANDA approval generic drug manufacturers must place on their warning labels the exact language used by brand-name drug manufacturers on their labels.  However, as courts since the *Levine* decision have emphasized, Congress' creation of a streamlined process for generic drugs to reach the market did not obviate the duty of generic drug manufacturers to ensure the safety and effectiveness of their products once they reach the market:

> [W]hile Congress plainly intended for a drug manufacturer to submit labeling identical to—or, the "same as"—the brand[-]name drug when seeking ANDA approval, the statutory scheme "is silent as to the manufacturer's obligations after the ANDA is granted.
>
> . . . .
>
> Of course, . . . "state laws can be pre-empted by federal regulations as well as by federal statutes."  The regulations on which Actavis [and Pliva] rel[y], however, do not purport to bar generic drug labeling modifications following initial approval.  Instead, they require only that a generic's label initially conform to the listed drug's; if the label does not, these regulations provide that an ANDA application will be denied.  They do not address post-approval modifications at all.

*Demahy v. Actavis*, 2010 WL 46513, at *5; *see also Stacel,* 620 F. Supp. 2d at 907.

As discussed above, the regulations affecting generic drug applications explicitly state that the CBE provisions apply to generic drug manufacturers just as they apply to brand-name manufacturers. *Compare* 21 C.F.R. § 314.97 *with* 21 C.F.R. § 314.70(c)(6)(iii). Accordingly, after securing ANDA approval, Actavis and Pliva could have unilaterally added to or strengthened the warnings on their labels or proposed major labeling changes pursuant to 21 C.F.R. § 314.70(b). As a result, the generic manufacturer defendants have failed to establish that it was impossible to comply with both federal and state requirements. The Supreme Court in *Levine* disposed of a similar impossibility preemption argument advanced by manufacturers of branded drugs, reasoning

> [I]t has remained a central premise of federal drug regulation that the manufacturer bears responsibility for the content of its label at all times. . . .
>
> . . . .
>
> Of course, the FDA retains authority to reject labeling changes made pursuant to the CBE regulation in its review of the manufacturer's supplemental application, just as it retains such authority in reviewing all supplemental applications. But absent clear evidence that the FDA would not have approved a change to Phenergan's label, we will not conclude that it was impossible for Wyeth to comply with both federal and state requirements. . . .
>
> . . . .
>
> Impossibility pre-emption is a demanding defense. On the record before us, Wyeth has failed to demonstrate that it was impossible for it to comply with both federal and state requirements. The CBE regulation permitted Wyeth to unilaterally strengthen its warning, and the mere fact that the FDA approved Phenergan's label does not establish that it would have prohibited such a change.

*Levine,* ___ U.S. at ___, 129 S.Ct. at 1197-1198 & 1198.

Actavis and Pliva argue that the core of the *Levine* "impossibility" analysis does not apply to the situation before this Court because the Supreme Court did not analyze the statutes, regulations, and FDA statements uniquely directed towards generic drug manufacturers. However,

the Supreme Court's broad language in *Levine*, its failure to confine such language to brand manufacturers, and its emphasis on one of the FDCA's "central" premises—drug manufacturers bear the primary responsibility for their drug labeling and the safety and effectiveness of their drugs—suggest that the better part of *Levine*'s reasoning applies with equal force to generic and branded manufacturers.   Other federal courts have applied *Levine's* reasoning to generic manufacturers' preemption arguments and reached the same conclusion.   The *Kellogg* court, for example, noted that

> [A]lthough the *Levine* decision did not definitively dispose of the issues [raised by generic manufacturers], its statement that '[f]ailure-to-warn actions, in particular, lend force to the FDCA's premise that manufacturers, not the FDA, bear primary responsibility for their drug labeling at all times,' does not appear to permit the caveat, 'except for generic drug manufacturers.'

612 F.Supp.2d at 441.   And the court in *Stacel* pointed out that instead of rendering it impossible for generic manufacturers to add warnings to their labeling in compliance with state law, the federal regulations made applicable to manufacturers of generic drugs actually make it possible for generic manufacturers to add such warnings without prior FDA approval:

> Given the sweeping language and overall conclusions of the Supreme Court in *Levine*, this court concludes that such claims should not be preempted as a matter of law. . . .
>
> . . . .
>
> Although Congress intended for ANDA applicants to submit identical labeling to the FDA when seeking ANDA approval . . .[,] the statute is silent as to the manufacturer's obligation after the ANDA is granted. But 21 C.F.R. § 314.97 is not silent—it states that generic drug manufacturers are obligated to comply with the same CBE provisions as brand-listed manufacturers are.

*Stacel,* 620 F. Supp. 2d at 906.

Moreover, the Eighth and Fifth Circuits, the only federal appellate courts to have considered the same issues presented by Actavis and Pliva's motions, both recently concluded that the generic manufacturers' argument that they cannot comply with both state and federal law because the CBE provision is unavailable to them is not persuasive. *See Mensing v. Wyeth*, 588 F.3d at 608 *and Demahy v. Actavis*, 2010 WL 46513, at *10 ("there is no indication of an agency policy, let alone congressional intent, to prevent generic manufacturers from proposing any and all labeling changes—no matter the significance of the change—through the prior approval process. . . . Indeed, manufacturers are *required* to use the prior approval process for most "labeling changes." *Id.* (emphasis in original) (citing 21 C.F.R. § 314.70(b)). The undersigned agrees with their rationale.

The Eighth Circuit in *Mensing* also explained that

> [i]n this case we need not decide whether generic manufacturers may unilaterally enhance a label warning through the CBE procedure because the generic defendants could have at least *proposed* a label change that the FDA could receive and impose uniformly on all metoclopramide manufacturers if approved.
>
> . . . .
>
> The availability of one particular procedure (the CBE process . . .) is immaterial to the preemption analysis in light of this clear directive to generic manufacturers and the availability of the prior approval process.
>
> . . . .
>
> Indeed, manufacturers are required to use the prior approval process for "labeling changes" (with a few exceptions including permissive use of the CBE process for warning enhancements).

*Id.* (emphasis in original) (citing 21 C.F.R. § 314.70(b)(2)(v)(A))[7].   The Fifth Circuit pointed out

---

[7]  The FDA has even stated that generic manufacturers may propose labeling changes in conjunction with ANDA applications: "An ANDA applicant who believes the labeling for a proposed drug product should differ from that approved for the reference listed drug should contact FDA to discuss whether

that:

> Though most courts to have considered the question . . . focus on the CBE process, the CBE regulation was not the exclusive, or even the primary, basis for rejecting preemption in *Levine*.  Rather, the [Supreme] Court explained that the brand name drug manufacturer's quest for preemption was grounded in a "more fundamental misunderstanding" of the regulatory regime: that the "FDA, rather than the manufacturer, bears primary responsibility for drug labeling."

*Demahy v. Actavis*, 2010 WL 46513, at *11.

Both the Fifth and the Eighth Circuit also observed that, at least as of 2007, the generic drug manufacturers could have suggested that the FDA send "Dear Health Care Professional" letters to pharmacists and physicians providing them with stronger warnings about the risks that long-term use of metoclopramide entails.  *See id.* at n. 108 & 109 and corresponding text (observing that "though generic manufacturers cannot send 'Dear Doctor' letters without prior FDA approval, they can suggest that he FDA send such letters on their behalf; the FDA will then send letters out if it determines that they are a necessary part of a risk evaluation and mitigation strategy."); *Mensing*, 588 F.3d at 610 ("In addition to proposing a label change, the generic manufacturers could have suggested that the FDA send out a warning letter to health care professionals.").

Actavis and Pliva contend that 21 C.F.R. § 314.150(b)(10), which states

> FDA ***may*** notify the applicant [] and . . . all other persons who manufacture or distribute identical, related, or similar drug products [that it will] . . . withdraw approval of the application or abbreviated new drug application . . . if the agency finds: (10) [t]hat the labeling for the drug product that is the subject of the abbreviated new drug application is no longer consistent with that for the listed drug . . . .

*id.*  (emphasis supplied), requires parallel drug labeling at all times throughout the life of the

---

labeling for both generic and listed drugs should be revised."  57 Fed. Reg. 17950, 17957, Cmt. 20.

product.   However, Section 314.150(b)(10) specifies only that the generic's label must be

"consistent with"— rather than "identical to"—the brand-name drug's label:

> . . . § 314.150 does not use the word "verbatim" or the phrase "same
> as" in its provisions applicable to withdrawal of an ANDA based on
> labeling changes. . . . [T]he term "no longer consistent with" does not
> mean "verbatim," "identical," or "same as." A generic label may be
> "consistent with" a name brand label even if it is not exactly the
> "same as" that label. Further, even if the generic label includes
> additional warnings that do not appear on the name brand label, these
> additional warnings may still be "consistent with" the general
> purpose of the name brand label to inform the consumer of the
> relevant risks of the drug. Regardless, the conspicuous use of the
> phrase "consistent with" as opposed to the phrase "same as" which
> appears in the FDA's regulatory comments, and the term "verbatim"
> which appears in Actavis's pleadings, suggests that generic labels
> may not necessarily have to be exactly the same as name brand labels
> throughout the life of the generic product. Thus, § 314.150 does not
> expressly prohibit generic manufacturers from making unilateral
> labeling changes under the CBE process, and therefore does not
> support Actavis[and Pliva]'s preemption argument.

*Demahy v. Wyeth*, 586 F. Supp. 2d at 654.

Moreover, the interpretation Actavis and Pliva urge is itself inconsistent with the text of

Section 314.97 of Title 21 of the Code of Federal Regulations, which took effect simultaneously

with Section 314.50(b)(1) of the same title.   See 57 Fed. Reg. at 17,950-01, 17,955, 17,965, &

17,970 (indicating regulations would take effect on June 29, 1992).   Sections 314.97, together with

Section 314.70(c)(6)(iii)(A), permits generic manufacturers who have already secured approval of

an ANDA to add or strengthen warnings on their approved product labels without first consulting

the FDA.   As explained in *Foster  v. American Home Products Corp.*, 29 F.3d 165, 169 (4th Cir.

1994):

> Although generic manufacturers must include the same labeling
> information as the equivalent name brand drug, they are also
> permitted to add or strengthen warnings and delete misleading

> statements on labels even without prior FDA approval. 21 C.F.R. §
> 314.70(c) (1993). The statutory scheme governing premarketing
> approval for drugs simply does not evidence Congressional intent to
> insulate generic drug manufacturers from liability for
> misrepresentations made regarding their products, or to otherwise
> alter state products liability law. Manufacturers of generic drugs, like
> all other manufacturers, are responsible for the representations they
> make regarding their products.

*Id.* (internal quotation marks omitted)).

Reviewing Section 314.150(b)(10) in context, the Fifth Circuit concluded that "the purpose of the regulation was not to prevent a generic manufacturer from improving or strengthening its warnings[, but . . .] to ensure that the FDA could require a generic manufacturer to modify its labeling to match labeling changes in the reference listed drug." *Demahy v. Actavis*, 2010 WL 46513. The undersigned agrees. Moreover, although the FDA "retains authority to reject labeling changes made pursuant to the CBE regulation . . . ," that authority does not operate to preempt the Mosley's claims "absent clear evidence that the FDA would not have approved a change to [metaclopramide's] label." *Levine,* ___ U.S. at ___, 129 S.Ct. at 1198.

And even if this Court were to accept Actavis' argument that the "consistent with" language of § 314.150(b)(10) requires generic manufacturers to use labeling identical to that of the corresponding brand-name drug throughout the drug's life, CBE provision notwithstanding, the generic drug manufacturers would still be able to comply with both state and federal law. Again, the CBE provision is not the only mechanism through which generic drug manufacturers may comply with state law duties: these manufacturers may also seek to add or strengthen warnings via the major changes procedure. *See* 21 C.F.R. § 314.70(b); *see also Mensing*, 588 F.3d at 606;

*Demahy v. Actavis*, 2010 WL 46513, at *10.[8]

Actavis and Pliva also point to an FDA statement[9] that appears to contradict the conclusion that generic manufacturers are free to utilize the CBE provision and effect unilateral labeling changes. Specifically, in the 2008 preamble to a proposed new rule published in the federal register, the FDA inserted a footnote stating that "CBE changes are not available for generic drugs approved under a new drug application . . . ." "Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices," 73 Fed. Reg. 2,848, 2,849 n. 1 (proposed Jan. 16, 2008). The final version of the rule omits this footnote's language. *See Demahy*

---

[8] The same analysis applies to the FDA Guidance document Pliva cites, which states in relevant part that "[a]ll labeling changes for ANDA products must be consistent with section 505(j) of the Act." *See* Guidance for Industry, Changes to an Approved NDA or ANDA, FDA Center for Drug Evaluation and Research at p. 24, ¶ X.A. (99 (rev. Apr. 2004), *available at* http://www.fda.gov/downloads/Drugs/ GuidanceComplianceRegulatoryInformation/Guidances/UCM077097.pdf (a prominent header on the revised guidance document indicates that it "Contains Nonbinding Recommendations," except insofar as it "adjusts reporting categories pursuant to section 506A of the [FDCA] and 21 C.F.R. 314.70 . . . ").

[9] Actavis and Pliva also cite amicus briefs filed by the United States in the *Colacicco v. Apotex Corp.* litigation. Actavis and Pliva cite a brief filed by the United States in the district court. (*See* Doc. 16 at 14 (citing *Colacicco v. Apotex Corp.*, Civ. No. 05-5500, Doc. 45 (E.D. Pa. May 20, 2006) ("*Colacicco* District Court litigation"))) Pliva also cites a brief filed by the United States in the same litigation before the Court of appeals. (*See* Doc. 44 at 25).

After the briefs were filed, the Supreme Court issued a decision vacating and remanding the lower court's judgment based upon preemption in favor of generic manufacturers, which the Third Circuit had affirmed. *See Colacicco v. Apotex*, ___ U.S. ___, 129 S. Ct. 1578 (2009) (remanding "for further consideration in light of *Levine*").

Subsequently, the United States withdrew its amicus briefs, specifically "notifying the Court that the United States does not take a position on whether plaintiffs' claims in this case are preempted." (*Colacicco* District Court Litigation at Doc. 64 (Jun. 18, 2009)) The United States explained to the district court that it was withdrawing the brief because "[t]he Food and Drug Administration ha[d] not yet conducted the sort of reexamination of various preemption issues following the Supreme Court's analysis in [*Levine*] that would be necessary to inform a position of the United States in this case." (*Id.*; Doc. 44 at 25).

Because the United States withdrew these briefs and has explicitly stated that it does not take a position on the preemption issues raised in this litigation, this Court has not considered the statements contained in the amicus briefs. *See Demahy v. Actavis*, 2010 WL 46513, at *9 ("Now withdrawn, the FDA's amicus views are muted and we do not consider them.").

26

*v. Actavis*, 2010 WL 46513, at *9 (citing "Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices," Final Rule, 73 Fed Reg. 49,603-1, 49,604 (effective Sep. 22, 2008)). Accordingly, no meritorious argument for deference can be made. Indeed, the Fifth Circuit refused to give deference to the statement on the ground that it was omitted, concluding that "[t]he FDA's 'earlier position,' either as amicus or commentator, is . . . 'deprived of all its claim to deference [] by the fact that it is no longer the agency's position.'" *Demahy v. Actavis*, 2010 WL 46513 (quoting *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 128 S. Ct. 999, 1009 (2008)).

Actavis and Pliva also contend that the plaintiffs' claims "impermissibly 'stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' . . .' because they seek to impose a duty on generic manufacturers to develop and strengthen warning labels continuously." (Doc. 16, 16-18) The generic manufacturers argue that imposing this duty upon them is contrary to controlling federal regulations and undermines a key purpose of the of the Hatch-Waxman Act, that is, "to *relax* the generic approval and labeling process to avoid duplicative efforts, thereby increasing the availability of low-cost generic drugs." (*Id*. at 16 (emphasis in original))

Making low-cost generic drugs available to the general public was the primary inspiration for passage of the Hatch-Waxman Act. This purpose was to be accomplished by allowing generic manufacturers to forego duplicative clinical trials prior to ANDA approval, trials that brand manufacturers are required to fund prior to NDA approval. *See Stacel,* 620 F. Supp. 2d at 906. However, as previously explained, after ANDA approval, generic manufacturers bear the same burden as brand manufacturers of providing a warning that adequately describes the risks associated

27

with the particular drug they are manufacturing.  *See id.* ("While . . . a generic manufacturer may

be spared any risk of negligence liability *during the application process*, there is no basis to

conclude that this protection against negligence suits continues after the ANDA is approved."

(emphasis in original)); *see also Kellogg,* 612 F.Supp. at 441 & 442 ("Although . . . the Hatch-

Waxman Amendment was devised to allow generic drug manufacturers to get their drugs to market

both cheaply and quickly, this purpose was to be achieved by permitting manufacturers to forego

duplicative clinical trials. It was *not* to be achieved by permitting manufacturers to engage in

negligent activities."  *Id.* (emphasis in original)).[10]

    The adverse event information and research data that generic manufacturers have a duty to

act upon may or may not result from post-approval clinical trials.  Instead, such information can be

procured from complaints reported by physicians and their patients and from published medical

---

[10] Actavis and Pliva quote Justice Breyer's *Levine* concurrence in support of their preemption arguments:

> As Justice Breyer noted in his concurring opinion, the FDA may "determine whether and when state tort law acts as a help or hindrance to achieving the [purposes] Congress sought," and can "embody those determinations in lawful specific regulations describing . . . when labeling requirements serve as a ceiling as well as a floor."  And "it is possible that such determinations would have preemptive effect."  That was not the case in [*Levine*]; but it is the case here.  In the context of generic drug labeling, the FDA has already done what Justice Breyer suggests it could do for name brands.  The FDA's Hatch-Waxman implementing regulations set both a floor and ceiling as to a generic's ability to vary its labeling from that of the name brand.

(Doc. 16 at 24) (quoting *Levine*, 129 S.Ct. at 1204 (Breyer, J., concurring) and citing 21 C.F.R. § 314.150; 57 Fed. Reg. at 17955); (*see also* Doc. 48 at 43-44).  However, "Actavis'[ and Pliva's] use of Justice Breyer's concurrence in *Levine* here is unavailing:  he said *if* an agency sets a floor and a ceiling, its actions may very well enjoy preemptive effect."  *Demahy v. Actavis*, 2010 WL 46513, at *12.  As explained in the foregoing analysis, "[n]o such regulation bearing the force of law is before" the Court, and "the FDA's retreat from its earlier position on preemption and the use of the CBE provision cast[] further doubt on Actavis'[] argument." *Id.*

literature,[11] as well as the reported results of any post-approval clinical trials conducted by brand manufacturers.  For example, the FDA's 2009 press release regarding its decision to require manufacturers to add a boxed warning to their metoclopramide labels indicates that the decision was based not only on FDA analysis of study data, but also upon "[r]ecently published analyses . . . [and] continued spontaneous reports of tardive dyskinesia in patients who used metoclopramide." *See* FDA 2009 Press Release.

A finding of obstacle-preemption based upon Hatch-Waxman, which Actavis and Pliva urge, would entail two conclusions:

> first, that Congress intended the name brand drug manufacturer to bear the sole burden of coping with incipient risks, even when it has ceased manufacturing the drug and left the market to generics; and [second], that Congress intended either that the name brand manufacturer be liable for all failure-to-warn claims—even those arising out of the use of generic substitutes—or, that the injured plaintiff be left with no remedy.

*Demahy v. Actavis*, 2010 WL 46513.  The Court is not persuaded that Congress intended for generic drug manufacturers to avoid liability for failure to warn, liability that brand manufacturers cannot avoid, despite the fact that generic manufacturers may be armed with risk information equivalent to, or in some cases greater than, that possessed by brand manufacturers.  As noted, "The bar to a

---

[11] Following FDA approval of a drug application, both brand and generic manufacturers are subject to continuing obligations to monitor and report adverse effects associated with the drug.  *See* 21 U.S.C. § 355(k); 21 C.F.R. §§ 314.80 (among other things, requiring drug manufacturers to keep records of and report adverse events associated with the use of their drug(s) regardless of whether they are "considered drug related," to review published literature relating to their drug(s), and to submit a report within 15 days of learning of an adverse event and to investigated those events); 314.81 (among other things, requiring drug manufacturers to report published literature and other information to FDA in annual and special reports); and 314.98 (making sections 314.80 and 314.81 applicable to manufacturers of generic drugs); *see also Mensing*, 588 F.3d at 609 ("21 C.F.R. § 314.98 requires that generic manufacturers follow the same record keeping and reporting of adverse drug experiences that name[-]brand manufacturers must undertake"); *Demahy v. Actavis*, 2010 WL 46513, at n. 22 and corresponding text.

finding of presumption is set even higher" when "federal law provides no remedy for an injured

consumer." *Id.* And "[c]ourts have been particularly reluctant to find preemption in such cases

without an unambiguous signal of congressional intent[, particularly . . . in cases that involve health

and safety concerns.'" *Id.*

It is also worthy to note that despite the fact that the FDCA has been amended since Hatch-

Waxman, Congress has failed to craft a preemption provision for (generic and/or branded)

prescription drugs:

> [t]he Hatch-Waxman Amendments are part of th[e FDCA's] 70 year
> history and they do not explicitly preempt suits against generic
> manufacturers. Congress could have crafted a preemption provision
> for generic drugs in its 1984 amendments, having done so for medical
> devices less than 10 years earlier. It chose not to do that. Seven in
> ten prescriptions filled in this country are now for generic drugs.
> After *Wyeth*, we must view with a questioning mind the generic
> defendants' argument that Congress silently intended to grant the
> manufacturers of most prescription drugs blanket immunity from
> state tort liability when they market inadequately labeled products.

*Mensing*, 588 F.3d at 607; *see also Demahy*, 2010 WL 46513, at *14. Holding that the Mosleys'

claims are preempted would be tantamount to concluding that Congress' goal of making low-cost

drugs widely available supersedes Congress' intent to ensure drug safety and effectiveness, the

underlying purpose of the FDCA:

> The generic defendants argue that the Hatch-Waxman Amendments
> supply the relevant statutory framework, rather than the whole
> FDCA. Yet additions to the statute like the Hatch-Waxman
> amendments must be considered part and parcel of the FDCA. These
> amendments provided for cheaper, expedited approval of generic
> drugs, not relief from the fundamental requirement of the FDCA that
> all marketed drugs remain safe.

*Mensing*, 588 F. 3d at 612; *see also Levine,* ___ U.S. at ____, 129 S.Ct. at 1199-1200; *Demahy v.*

*Actavis*, 2010 WL 46513, at *14 ( The Hatch-Waxman "Amendments serve as just

30

that—amendments—to the FDCA . . .   In this wider context, nothing about the Hatch-Waxman Amendments, and their goal of cheaper drugs, obviates the concomitant prescription that all drugs, even cheaper ones, remain safe.").   Therefore, both the impossibility and obstacle preemption arguments fail, and the plaintiffs' claims are not subject to dismissal on either basis.

     **F.**     <u>**Actavis' Motion to Dismiss a Portion of Plaintiffs' Misrepresentation and Fraud Claims**</u>.

Actavis contends that plaintiffs' fraud and misrepresentation claims, to the extent they require proof of any type of fraud on the FDA, are impliedly preempted under *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001).   In *Buckman*, the Supreme Court held that "plaintiffs' state-law fraud-on-the-FDA claims conflict with, and are therefore impliedly pre-empted by, federal law." *Id*. at 348.   However, the *Buckman* decision does not stand for the proposition that all claims requiring any *proof* of fraud on the FDA are preempted.   Instead, as the Second Circuit has explained:

> The *Buckman* Court suggested that the source and "vintage" of the duty the drug maker is accused of breaching in "fraud-on-the-FDA" claims is different from the source and "vintage" of the duty that obtains in traditional tort claims.   On this basis, the *Buckman* Court distinguished the plaintiff's unpreempted claims in *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 [](1984), from those before it and wrote: "*Silkwood*'s claim was not based on any sort of fraud-on-the-agency theory, but on traditional state tort law principles of the duty of care owed by the producer of plutonium fuel pins to an employee working in its plant." *Buckman*, 531 U.S. at 352.

> Significantly, all of the claims advanced . . . in this case are premised on traditional duties between a product manufacturer and [state] consumers.   None of them derives from, or is based on, a newly-concocted duty between a manufacturer and a federal agency. As a result, were we to conclude that [such state law] claims were preempted, we would be holding that Congress, without any explicit expression of intent, should nonetheless be taken to have modified

(and, in effect, gutted) traditional state law duties between pharmaceutical companies and their consumers. We see no reason, nor can we identify any precedent, to justify such a result.

. . . .

 . . . . the plaintiffs' claims in the case before us "parallel federal safety requirements"  but are not premised principally (let alone exclusively) on a drug maker's failure to comply with federal disclosure requirements. On the contrary, the plaintiffs' complaints allege a wide range of putative violations of common law duties long-recognized by [the state] tort regime. These pre-existing common law claims [depend upon] evidence of fraud in FDA disclosures. But, unlike the claims in *Buckman*, they are anything but based solely on the wrong of defrauding the FDA. Given *Buckman*'s explanation of *Medtronic*, *Buckman* cannot be read as precluding such preexisting common law liability based on other wrongs, even when such liability survives only because there was also evidence of fraud against the FDA.

*Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 94-95 (2d Cir. 2006), *aff'd sub nom.*, *Warner-Lambert Co., LLC v. Kent*, 552 U.S. 440 (U.S. 2008) (per curiam); *see also In re Medtronic, Inc., Implantable Defribillators Litig.*, 465 F. Supp. 2d 886, 900 (D. Minn. 2006); *Globetti v. Sandoz Pharm. Corp.*, No. CV98-TMP-2649-S, 2001 WL 419160 (N.D. Ala. March 5, 2001).   Rather, *Buckman* held that so-called "fraud-on-the-FDA" claims are preempted when plaintiffs "would not be relying on traditional state tort law which had predated the federal enactments in question[]," but rather upon "the existence of th[o]se federal enactments [a]s a critical element in their case." *Buckman*, 531 U.S. at 353; *Couick v. Wyeth, Inc.*, No. 3:09-cv-210-RJC-DSC, 2009 WL 4644394 (W.D. N.C. Dec. 7, 2009).[12]

_____

[12]Actavis also cites an Amicus Brief filed by the United States on behalf of the FDA in *Warner-Lambert Co., LLC v. Kimberly Kent*, Case No. 06-1498 (U.S. Nov. 2007), *available at* http://www.justice.gov/osg/briefs/2007/3mer/1ami/2006-1498.mer.ami.html.  Actavis' brief construes the United States' amicus brief as arguing that "whether couched as a 'traditional' tort or as a 'fraud on the FDA' claim, where the claim 'at bottom' requires a determination of fraud on a federal agency it is *Buckman*-preempted."  (Doc. 16 at 19).

Only one paragraph of the Mosleys' complaint contains an allegation that arguably sounds in "fraud-on -the-FDA."  The paragraph reads: "Defendants misrepresented to the FDA, Plaintiffs, and the health care industry the safety and effectiveness of Reglan/metoclopramide and/or fraudulently, intentionally and/or negligently concealed material information, including adverse information regarding the safety and effectiveness of Reglan/metoclopramide."  (Doc. 1, ¶ 4.13)  Actavis has not established that the foregoing allegation encompasses a duty that the defendants owed solely to the FDA (i.e., that is not rooted in traditional state tort law predating FDA enactments supplying a corresponding duty).

Accordingly, Actavis' effort to dismiss a portion of the plaintiffs' claims on the basis that they constitute "fraud-on-the-FDA" also fails.    To be clear, the Mosleys lack standing to claim damages suffered by the FDA.  However, the "plaintiffs may use evidence—if they are able to produce it—of [the generic manufacturers]'[] efforts to manipulate the regulatory process" and of the generic manufacturers' failures, if any, to disclose material information to FDA.  *In re Medtronic*, 465 F. Supp. 2d at 900 (D. Minn. 2006); *Kellogg,* 612 F.Supp.2d at 442.   "At most," such state-law claims "operate in tandem with the anti-fraud provisions of the [federal] statute, but this alone is not enough to require a finding of preemption." *In re Pharm. Indus. Average Wholesale Price Litig*., 582 F. 3d 156, 177 (1st Cir. 2009).

---

In *Warner-Lambert*, an equally divided Supreme Court affirmed the Second Circuit's opinion in *Desiano v. Warner-Lambert & Co.* by issuing a four-four per curiam decision.  Although the two-sentence-long decision reveals no hint of how the full Supreme Court might view the reasoning Actavis cites, the Second Circuit's *Desiano* opinion remains persuasive authority, and this Court considers it—and the cited reasoning of the other federal circuit and district courts—more "thorough[], consistent[], and persuasive[]" than the "agency's explanation of state law's impact on the federal scheme" laid out in the amicus brief.  *See Levine*, ___ U.S. ___, 129 S. Ct. 1187, 1201 (2009) ("The weight we accord the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness.").

## <u>CONCLUSION</u>

Accordingly, both Actavis' motion to dismiss and Pliva's motion for judgment on the pleadings are **DENIED**.

**DONE** this the 25th day of January, 2010.

/s/ Kristi K. DuBose
**KRISTI K. DUBOSE**
**UNITED STATES DISTRICT JUDGE**